## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

---

| | |
|---|---|
| SAMUEL BARTLEY STEELE )<br>Plaintiff )<br>v. )<br> )<br>ANTHONY RICIGLIANO, BOB BOWMAN, BOSTON )<br>RED SOX BASEBALL CLUB LIMITED PARTNERSHIP, )<br>BRETT LANGEFELS, CRAIG BARRY, DONATO MUSIC )<br>SERVICES, INC., FENWAY SPORTS GROUP a/k/a FSG f/k/a )<br>New England Sports Enterprises LLC, JACK ROVNER, JAY )<br>ROURKE, JOHN BONGIOVI, individually and d/b/a Bon Jovi )<br>Publishing, JOHN W. HENRY, LAWRENCE LUCCHINO, )<br>MAJOR LEAGUE BASEBALL ADVANCED MEDIA, L.P., )<br>MAJOR LEAGUE BASEBALL PROPERTIES, INC., a/k/a and/or )<br>d/b/a Major League Baseball Productions, MARK SHIMMEL )<br>individually and d/b/a Mark Shimmel Music, MIKE DEE, NEW )<br>ENGLAND SPORTS ENTERPRISES LLC f/d/b/a Fenway Sports )<br>Group f/a/k/a FSG, RICHARD SAMBORA individually and d/b/a) )<br>Aggressive Music, SAM KENNEDY, THOMAS C. WERNER, )<br>TIME WARNER INC., TURNER BROADCASTING SYSTEM, )<br>INC., TURNER SPORTS, INC., TURNER STUDIOS, INC, )<br>VECTOR MANAGEMENT LLC f/k/a and/or a/k/a and/or )<br>successor in interest to Vector Management, WILLIAM FALCON )<br>individually and d/b/a Pretty Blue Songs, )<br>Defendants ) | No. |

---

## VERIFIED COMPLAINT AND JURY DEMAND

## I.    JURISDICTION AND VENUE

1.   This Court has original and exclusive jurisdiction of this action under 28 U.S.C. §

1338(a) because the action arises under the Copyright Act, 17 U.S.C. § 101 et seq.,

including 17 U.S.C. § 114.

1

2.   This Court has personal jurisdiction over defendants because defendants conduct systematic and continuous business activity in Massachusetts and/or because the claims against defendants arise directly out of, or relate to, defendants' contacts with Massachusetts.  See M.G.L. § 223A(3).

3.   Venue in this Court is proper pursuant to 28 U.S.C. § 1391 since defendants or their agents are subject to personal jurisdiction in this jurisdiction and because a substantial part of the events, actions, and omissions giving rise to the claims occurred in this jurisdiction.

## II.   PLAINTIFF

4.   Plaintiff Samuel Bartley Steele (ASCAP Member # 1712916) ("Steele") is a natural person who resides at 80 Park Street, Chelsea, Massachusetts.

5.   Steele does business as Bart Steele Publishing Company (ASCAP Member/co-publisher administrator # 0120952) ("Steele Publishing"), an unincorporated business located at 80 Park Street, Chelsea, Massachusetts.

6.   Steele d/b/a Steele Publishing owns the publishing rights to Steele's copyrighted musical works "Man I Really Love this Team," also known as "Man I Love this Team" ("Steele Team Song" or "Song") and "Man I Really Love This Town" ("Steele Town Song"). Both of Steele's Songs were written, performed, and recorded in the Commonwealth of Massachusetts.

7.   Steele does business as Steele Recordz, an unincorporated business located at 80 Park Street, Chelsea, Massachusetts.

2

8.  Steele d/b/a Steele Recordz owns the copyrighted sound recording of the Steele Team Song.

9.  A copy of Steele's "SR" (Sound Recording) Certificate of Copyright Registration (No. SR 640-991) for the Steele Team Song is attached at Exhibit 1.

## III.  DEFENDANTS

10. Defendant Anthony Ricigliano ("Ricigliano") is a natural person residing in Scarsdale, New York.  Defendant Ricigliano is a musicologist and president of defendant Donato Music Services, Inc.

11. Defendant Bob Bowman ("Bowman") is a natural person residing in Connecticut. Defendant Bowman is the Chief Executive Officer of defendant Major League Baseball Advanced Media, L.P.

12. Defendant Boston Red Sox Baseball Club Limited Partnership ("Boston Red Sox") is a Massachusetts limited partnership with a principal place of business at 4 Yawkey Way, Boston, Massachusetts 02215.

13. Defendant Brett Langefels ("Langefels") is a natural person residing, on information and belief, in Atlanta, Georgia.  Defendant Langefels was, at all pertinent times, an editor for Defendant Turner Studios, Inc.

14. Defendant Craig Barry ("Barry") is a natural person residing, on information and belief, in Atlanta, Georgia.  Defendant Barry was at all pertinent times and is Senior Vice President and Creative Director of defendant Turner Sports, Inc.

15. Defendant Donato Music Services, Inc. ("Donato"), is a New York corporation located at 74 Malvern Road, Scarsdale, NY 10583-4844 with a principal office at 203 Glenbrook Road, Upper Nyack, New York 10960.  Defendant Ricigliano is president of defendant Donato.

16. Defendant Fenway Sports Group, formerly known as New England Sports Enterprises, LLC ("FSG") is a Massachusetts business located 82 Brookline Avenue, Boston, Massachusetts, 02215.

17. Defendant Jack Rovner  ("Rovner") is a natural person who, on information and belief, resides in New York.  Defendant Rovner is a founding member of defendant Vector Management f/k/a and/or a/k/a and/or successor in interest to Vector Management LLC and was at all pertinent times manager for the band Bon Jovi.

18. Defendant Jay Rourke  ("Rourke") is a natural person who, on information and belief, resides in Massachusetts and was an employee, agent, or servant of defendant Red Sox at all pertinent times.

19. Defendant John Bongiovi individually and d/b/a Bon Jovi Publishing ("Bongiovi") is a natural person who, on information and belief, resides in New Jersey.  Bongiovi is the lead singer for the band "Bon Jovi."

20. Defendant John W. Henry ("Henry") is a natural person who resides in Florida.  Henry is the Managing Principal Owner of the Boston Red Sox.  Henry is also a principal owner of New England Sports Ventures, LLC ("NESV"), a Delaware limited liability company with a Massachusetts address at 4 Yawkey Way, Boston, MA 02215.  NESV

owns defendants Boston Red Sox, FSG, and New England Sports Enterprises LLC, as well as Fenway Park.

21. Defendant Lawrence Lucchino ("Lucchino") is a natural person who resides in Massachusetts.  Lucchino is an owner and President/Chief Executive Officer of the Boston Red Sox.  Lucchino is also an owner of NESV.  NESV owns defendants Boston Red Sox, FSG, and New England Sports Enterprises LLC, as well as Fenway Park.

22. Defendant Major League Baseball Advanced Media, L.P. ("MLBAM") is a Delaware limited partnership with a principal place of business located at 75 9th Ave., 5th Fl., New York, NY 10011.

23. Defendant Major League Baseball Properties, Inc. ("MLB") is a New York corporation with a principle place of business located at 245 Park Avenue, New York, NY 10167-0002. MLB does business and is also sometimes known as Major League Baseball Productions, which is a division of MLB.

24. Defendant Mark Shimmel individually and d/b/a Mark Shimmel Music ("Shimmel"), is a natural person who, on information and belief, resides in New York and was, at all pertinent times, "musical consultant" for defendants Turner Broadcasting System, Inc. and Time Warner.

25. Defendant Mike Dee is a natural person who resides, on information and belief, in Miami, Florida and was, at all pertinent times, president of defendant FSG and, concurrently, chief operating officer of defendant Boston Red Sox.

26. Defendant New England Sports Enterprises LLC f/d/b/a Fenway Sports Group ("NESE") is a Delaware limited liability company with offices at 82 Brookline Avenue, Boston, MA 02215.  Defendant NESE did business as "Fenway Sports Group" from 2004-2008.  Defendant NESE is, on information and belief, managed by defendant Henry and NESV.

27. Defendant Richard Sambora individually and d/b/a Aggressive Music ("Sambora") is a natural person who, on information and belief, resides in California.  Sambora is the lead guitarist for the band Bon Jovi.

28. Defendant Sam Kennedy ("Kennedy") is a natural person residing in Massachusetts and is the current president of defendant FSG and, was at all pertinent times, Vice President of Sales for defendants FSG and NESE and, concurrently, Vice President for Sales and Marketing for defendant Red Sox.

29. Defendant Thomas C. Werner ("Werner") is a natural person who resides in California. Werner is Chairman of defendant Red Sox and a principal owner of NESV.  NESV owns defendants Boston Red Sox, FSG, and NESE,  as well as Fenway Park.

30. Defendant Time Warner Inc. ("Time Warner"), is a Delaware corporation with a principal place of business located at One Time Warner Center, New York, NY 10019. Time Warner owns defendant Turner Broadcasting System, Inc.

31. Defendant Turner Broadcasting System, Inc., ("TBS") is a Georgia corporation located at One CNN Center, Atlanta, Georgia 30303.  Defendant TBS is owned by defendant Time Warner.

6

32. Defendant Turner Sports, Inc. ("Turner Sports") is a Georgia corporation located at 1015 Techwood Dr. Atlanta, GA 30303, with a principal office address at One CNN Center, Atlanta, GA 30303.  Defendant Turner Sports is the sports production and marketing division of defendant TBS.

33. Defendant Turner Studios, Inc. ("Turner Studios") a Georgia corporation located at 1050 Techwood Drive, Atlanta, GA 30303, with a principal office address at One CNN Center, Atlanta, GA 30303.   Defendant Turner Studios is the production division of defendant TBS.

34. Defendant Vector Management LLC, f/k/a, a/k/a, and/or successor in interest to, Vector Management ("Vector") is a Delaware limited liability company located at 1607 17th Ave S. Nashville, TN 37212.

35. Defendant Billy Falcon, individually and d/b/a Pretty Blue Songs ("Falcon") is a natural person residing in Nashville, Tennessee.  Defendant Falcon is a songwriter who has written many of Bon Jovi's songs for them.

## IV.   STEELE'S SOUND RECORDING: "MAN I REALLY LOVE THIS TEAM"

36. In September 2004, Steele composed and wrote a country-rock Boston Red Sox and baseball-themed musical work entitled "Man I Really Love This Team," i.e., the Steele Team Song referenced at ¶ 6, above.  The Steele Team Song is, from beginning to fade-ending, 2:38:90-long.

37. In September 2004, Steele, d/b/a Steele Recordz, produced the Steele Team Song, including recording, mixing, and mastering to digital compact disc (CD).

38. The resulting digital audio work – the Steele Team Song sound recording – and defendants' infringement of Steele's exclusive rights to reproduce said sound recording, and any other unauthorized use thereof, pursuant to 17 U.S.C. § 114, is the subject of this complaint. Steele's instant complaint is based on Steele's exclusive rights as reflected in his 2009 SR copyright registration. <u>See</u> Exhibit 1.

39. Steele, *pro se*, previously sued several defendants named herein and others for infringement of his separate and distinct rights in the Steele Team Song relating to his earlier 2006 Performing Arts ("PA") copyright registration, pursuant to 17 U.S.C. § 106, in <u>Steele</u> v. <u>TBS</u>, et al., 08-11727 (D. Mass.), appeal pending (09-2571) (1ˢᵗ Cir.).

40. The recording, mixing, and mastering was done by Steele, d/b/a Steele Recordz', exclusively in the digital domain, using a digital audio workstation ("DAW").

41. The digital nature of the Steele Team Song Sound Recording made reproduction and/or other unauthorized use of the Steele Team Song simple for anyone with a computer and access to the song. The terms "Steele Team Song" or Steele's "Song" as used herein refer to the Steele Team Song sound recording and not its composition.

42. On October 4, 2004, Steele, d/b/a Steele Recordz started marketing and distributing thousands of digital copies of the Steele Team Song on CDs in the metropolitan Boston area and environs, as well as regionally and nationally through CD mailings.

43. The Steele Team Song was also distributed in various other digital audio formats (e.g., MP3, .aiff, and .wav files) via e-mail and on the internet through several websites.

8

44. The Steele Team Song became extremely popular.  In the fall of 2004 the Steele Team Song was played on Boston Sports Radio 850 AM, sing-alongs were held at the Cask 'n Flagon sports bar (among others) outside Fenway Park, and Steele performed live on local Boston television stations.

45. The website www.Fenwaynation.com posted the Steele Team Song and it was played thousands of times from that site in 2004-2005.

46. During the fall of 2004, www.Fenwaynation.com regularly received more than 180,000 daily "hits," or visitors to their website, during which time the Steele Team Song was posted.

47. The link to the Steele Team Song was also posted at www.mvn.com (the largest independent sports website in the country), www.phoenix.com, and www.mikehallal.com.

48. During the fall of 2004  Steele gave out thousands of CDs containing the Steele Team Song to fans and Boston Red Sox officials at Fenway Park.

49. Also in the fall of 2004, Steele sent CDs of the Steele Team Song with lyric sheets to defendant John Henry, defendant Boston Red Sox players Johnny Damon, Bronson Arroyo, team captain Jason Varitek, and Kevin Millar, Red Sox NESN announcer Jerry Remy, and General Manager Theo Epstein.

50. Steele's roommate in 2004 and 2005 worked inside Fenway Park and handed out CDs of the Steele Team Song to Boston Red Sox executives inside the park during in 2004 and 2005.

51. In the fall of 2004, Steele often stood outside the Boston Red Sox's executives' entrance to Fenway Park on Brookline Avenue, around the corner from Yawkey Way, handing CDs of the Steele Team Song to anyone in a suit using the executive entrance.

52. In October 2004, Irene Barr, a music agent acting on Steele's behalf, spoke with defendant Jay Rourke of defendant Boston Red Sox about the Red Sox using the Steele Team Song as part of a baseball promotion.

53. On October 20, 2004, Mr. Rourke informed Ms. Barr that defendant Boston Red Sox were very interested in the Steele Team Song.

54. Mr. Rourke solicited the Steele Team Song from Ms. Barr.

55. Ms. Barr e-mailed the Steele Team Song to Mr. Rourke on that same day, October 20, 2004.

56. Mr. Rourke received Ms. Barr's e-mail and the attached Steele Team Song on October 20, 2004.

57. Defendant Boston Red Sox admitted in court papers in <u>Steele</u> v. <u>TBS</u>, et al., 08-11727 (D. Mass.) that they received the Steele Team Song attached to an e-mail from Ms. Barr.

58. In June 2005, early into the Red Sox' first season in 86 years as reigning World Champions, Chelsea City Council member Ron Morgese honored Steele for writing the "Song that Broke the Curse of the Bambino."

59. Later in 2005, Steele performed the Steele Team Song on Chelsea Community Television as part of a Hurricane Katrina relief effort.

60. From October 2004 through June 2006, Steele sent numerous hard copy letters (enclosing CDs of the Steele Team Song as well as paper lyric sheets) and e-mails (with digital copies of the Steele Team Song attached and/or links to a website from which the Steele Team Song could be played) to defendants Boston Red Sox, MLB, and MLBAM.

61. MLBAM owns and operates www.mlb.com and is also known as "MLB.com."

62. In October 2004 and November 2004, Steele repeatedly contacted Boston Red Sox, MLBAM, MLB.com, and MLB online through "contact us" submission web pages on www.mlb.com.

63. Steele included in his above submissions to defendants Boston Red Sox, MLBAM,  and MLB a web link to the Steele Team Song and invited the recipients to contact Steele to discuss how the Steele Team Song might be used to promote baseball around the country.

64. Steele's 2004 letters, e-mails, and online submissions to the Boston Red Sox, MLB, and MLBAM suggested that the Steele Team Song's lyrics could be adapted to other teams and towns in addition to the Boston Red Sox and thereby used as part of a nationwide – but locally targeted – baseball marketing campaign.

65. In November 2004  Steele, despite not having heard back from the Boston Red Sox, MLB, or MLBAM, began working on a derivative of his Steele Team Song that would be marketable to any city with a big-league baseball team.

66. After the 2004 World Series – and Red Sox victory – in November 2004, Steele continued to send letters, e-mails, and online submissions to the Boston Red Sox, MLB, and MLBAM through June 2006.

67. MLB and MLBAM have never denied receiving Steele's letters or digital audio versions of the Steele Team Song.

68. Following the Boston Red Sox 2004 World Series victory, Steele added to his ongoing submissions to the Boston Red Sox, MLB, and MLBAM, a new lyric sheet containing alternative verses for the derivative song he was working on, i.e., the "Steele Town Song" referenced at ¶ 6, above.

69. Steele's new lyrics were crafted so as to enable his derivative Steele Town Song to be used to promote local major league baseball in cities across the nation, as he had been suggesting - and continued to suggest - to the Boston Red Sox, MLB, and MLBAM.

70. The Steele Town Song draft lyric sheets contained two derivative (of the Steele Team Song) verses, including a line that replaced "hometown team" with "town."

71. Steele's 2004-2006 letters, e-mails, and online submissions to the Boston Red Sox, MLB, and MLB.com also suggested that a "country" song would be more marketable for baseball, both nationally and internationally.

72. In 2005 Steele enrolled in a Masters Certificate Program for Music Production at the Berklee College of Music, which he completed in 2006.

73. In the summer of 2005 through the winter of 2006, Steele and his band performed weekly shows at the Avon Café (now O'Gannon's), in Chelsea, Massachusetts.

74. During these weekly shows in 2005 and 2006, Steele would end the night with a rowdy crowd-assisted version of the Steele Town Song in tribute to his adopted hometown of Chelsea, Massachusetts.

75. In July 2006 Steele completed the Steele Town Song and titled it "Man I Love This Town" or, alternatively, "(Man I Really) Love This Town."

76. On August 22, 2006 Steele, d/b/a Steele Recordz, began recording sessions for the Steele Town Song.

77. By the end of August 2006 most of the Steele Town Song had been digitally recorded and mixed down into "stems" on Steele's DAW, Digidesign Company's (now Avid) "Pro Tools."  Steele, d/b/a Steele Recordz completed production of the Steele Town Song sound recording in October 2009.

78. On August 14, 2007 the Boston Globe featured Steele on the cover of its Living/Arts Section for an article titled "Songs in the Key of Chelsea."

79. Steele is quoted in the August 14, 2007 Boston Globe article as saying "I Just Love This Town."

80. Less than two weeks later, as further detailed below, on August 27, 2007, an audiovisual advertisement promoting baseball was released on MLBAM's website, www.mlb.com ("MLB Audiovisual").

81. The MLB Audiovisual was exactly 2:38:90-long from beginning to fade-ending.

82. The MLB Audiovisual included a country-rock soundtrack of Bon Jovi (including defendants Bongiovi and Sambora) performing and defendant Bongiovi singing the lyrics "I Love This Town."

83. The Bon Jovi-performed "I Love This Town" soundtrack was exactly 2:38:90-long from beginning to fade-ending.

84. Steele First learned of the MLB Audiovisual in early October 2007 when a friend called Steele to congratulate him on selling his song to Major League Baseball, TBS, and Bon Jovi.

85. The MLB Audiovisual was part of a nationwide marketing plan to advertise that the TBS-owned television network "TBS" was to broadcast part of the playoffs that year.

86. Fox television also used a derivative version of the MLB Audiovisual for similar purposes.

87. The MLB Audiovisual was, as Steele had proposed, later edited to create "localized" versions that were played in various ballparks in different cities, among other places.

88. The MLB Audiovisual and the Steele Team Song were and are identical in length, each exactly 2:38:90-long from beginning to fade-ending.

89. The MLB Audiovisual contains numerous audio and visual congruities with the Steele Team Song in addition to overall length, as detailed in Steele's previous court filings in Steele v. TBS et al., 08-11727 (D. Mass.) including, but not limited to, Steele's Complaint, opposition to defendants' motions to dismiss, opposition to defendants' motions for summary judgment, and his motion for Reconsideration, incorporated herein by reference.

14

90. Further examples of similarities between the MLB Audiovisual and the Steele Team Song sound recording are detailed in Steele's opening brief and reply brief in his appeal of <u>Steele</u> v. <u>TBS</u>, et al., 08-11727 (D. Mass.), No. 09-2571 (1ˢᵗ Cir.) (pending), incorporated herein by reference.

91. One example of the dozens of congruities pointing to defendants' use of Steele's Song as a temp track is that, at the exact moment Steele sings "Yawkey Way," the MLB Audiovisual features an image of the Yawkey Way street sign – with a digitally superimposed adjacent TBS "street sign."

92. The MLB Audiovisual displayed baseball images of 21 of the 30 major league teams, with the heaviest emphasis on images of the Boston Red Sox.

93. The MLB Audiovisual showed images of the Boston Red Sox in 22% of the MLB Audiovisual's baseball video sequences.

94. If the 21 teams were featured equally, each team would have occupied less than 5% of the MLB Audiovisual's baseball sequences.  The MLB Audiovisual shows the Boston Red Sox more than four times that amount.

95. On March 25, 2008 the American Society of Composers, Authors, and Publishers ("ASCAP") issued "discrepancy letters" to Bon Jovi band members, including defendants Bongiovi and Sambora, the band's publishers and labels, and to Steele, relating to ownership of the work "I Love This Town" from Bon Jovi's "Lost Highway" album.

96. ASCAP shortly thereafter froze royalties on the work registered with ASCAP by Bon Jovi called "I Love This Town."

15

97. No member of Bon Jovi or their agent, publishers, or record labels have requested that ASCAP unfreeze said royalties.

98. MLBAM, the claimed copyright owner of the MLB Audiovisual – including its constituent Bon Jovi performed soundtrack – has not requested that ASCAP unfreeze said royalties.

99. ASCAP's freeze on Bon Jovi's royalties remains in place.

V.   **TEMP TRACKING AND COPYRIGHT INFRINGEMENT**

100.   The unauthorized and infringing use of a sound recording as a temporary soundtrack (a "temp track") while creating and editing an audiovisual ("temp tracking")  is a widespread and common practice in the music, advertising, and film industries.

101.   It is so common and widespread that music, film, and advertising industry representatives, producers, musicologists, and liability carriers hold conferences and publish articles on how to address copyright liability issues arising from temp tracking.

102.   Those concerned with unauthorized temp tracking frame the copyright infringement issues in one of two divergent ways: (1) how to minimize or eliminate the practice of temp tracking or (2) how to conceal temp tracking to avoid exposure to liability for copyright infringement.

103.   According to a November 29, 2002 article in the online film and audiovisual trade journal, "SHOOT," entitled "Temp Talk:  Copyright Issues and Legal Liabilities" audiovisual commercial editors typically edit their video to music, often in the form of "an original score, a drumbeat, or a temp track."  See

16

https://www.shootonline.com/go/news-view.11699.Temp-Talk--Copyright-Issues-And-Legal-Liabilities.html,

attached as Exhibit 2.

104.    According to the "Temp Talk:  Copyright Issues and Legal Liabilities" article, "temp tracking," is the practice - widespread in the advertising industry - whereby a copyrighted musical work is used without the copyright owner's permission, "for the purpose of editing [video footage] and presenting a prospective [audiovisual] commercial to the client."  See Exhibit 2.

105.    According to May 1, 2006 article called "Pale Imitations" in "'boards" magazine, an online commercial production trade journal, after editing video to a temp track, an audiovisual commercial's producer will later attempt  to select "final" music to replace the unlicensed temp track.  See

http://www.boardsmag.com/articles/magazine/20060501/pale.html, attached as Exhibit 3.

106.    According to the "Pale Imitations" article, finding suitable replacement music can be "pretty hard:"  "[g]enerally, [video] editors have two to three weeks alone with the creative team and the producer in the [editing] suite, and they cut to [the temp track]" and "[t]hey find something that has a nice pattern, so that all the cuts line up to it; the payoff, the shot, it's perfect.  Now try to replace that.  It's pretty hard."  See Exhibit 3.

107.    According to a February 2, 2009 essay called "Temp Tracks and Their Purpose," in the weblog (or "blog") "Critical Noise" which writes about "soundscape" issues, to

replace a temp track with different music, the new music must have the same tempo as the temp track to which the video was originally edited or the new music must – if possible – be "beat-matched" to follow the video's edits.  See

http://criticalnoise.blogspot.com/2009/02/temp-tracks-and-their-purpose.html?utm_source=feedburner&utm_medium=feed&utm_campaign=Feed%3A+CriticalNoise+%28CRITICAL+NOISE%29,

attached as Exhibit 4.

108.    Of the MLB Audiovisual's 155 visual sequences, 149 of them, or 96%, are "beat matched" to the Steele Team Song sound recording, in their identical 2:38:90-lengths, to fade endings.

109.    According to an October 4, 2002 article about the Association of Music Producers ("AMP") called "AMP Seeks Permanent Solutions to Temp Tracks," in the online film and audiovisual trade journal, "SHOOT," because temp tracking presents copyright infringement issues, advertisers, producers, and their musicologists work to downplay their use of temp tracks.  See

http://www.shootonline.com/go/index.php?name=Articles&op=view&id=11996,

attached as Exhibit 5.

110.    According to the "Temp Talk:  Copyright Issues and Legal Liabilities" article, some musicologists, like defendant MLB's expert in the related case of Steele v. TBS, et al., No. 08-11727 (D. Mass), defendant Ricigliano, do "commercial applications," that is, "clearing" an audiovisual commercial by opining on whether the "final" soundtrack

infringes the copyrighted musical composition- the temp track - to which the

commercial's video was cut.  See Exhibit 2.

111.    In a January 1, 2003 online article in "'boards" magazine called "Music Houses Look

to Agencies for Refrain," defendant Ricigliano is quoted as saying "[temp track copyright

infringement] is a much bigger problem than most people know."  See

http://www.boardsmag.com/articles/magazine/20030101/temp.html,

attached as Exhibit 6.

112.    AMP president Jeff Rosner said, in a November 8, 2002 article in SHOOT that

"[a]gencies are careful about [temp tracking]…  But they don't realize the depth or

magnitude of how many cases actually are brought because every time a case is settled,

one of the stipulations is you can't talk about it."  See

http://web8.shootonline.com/go/news-view.11784.Temp-Issues.html,

attached as Exhibit 7.

113.    According to the "Temp Talk:  Copyright Issues and Legal Liabilities" article,

Ricigliano advises his temp track-using clients on how to defend against copyright

claims, for example advising his clients to use more than one temp track where possible:

"There is a big difference between one and five temp tracks… [More than one piece] of

music makes the final track more defensible," and recommended that circulation of temp

tracks be limited.  See Exhibit 2 (brackets original).

114.    Use of a temp track, as described and defined above, also sometimes called a

"reference" or "guide" track, without the owner's permission, violates the temp track

copyright owner's exclusive rights to reproduce their work and constitutes unauthorized use of a copyrighted work, pursuant to 17 U.S.C. § 101, et seq., including § 114.

115.    Temp tracking is a secretive process and the copyright owner of an illegally used temp track rarely becomes aware of the infringing use of their copyrighted work, particularly where the infringer hires a musicologist to help conceal the infringement.

116.    The process of unauthorized temp tracking is reasonably known among audiovisual editors, producers, directors, creators, advertisers, musicians, musicologists, filmmakers, insurance companies, and others involved in the music, film, and advertising industry as infringing the copyright of the owner of the temp track.

## VI.    STEELE'S CLAIMS ADDRESS LONGSTANDING INFRINGING PRACTICES BY CERTAIN DEFENDANTS

117.    Certain defendants have regularly engaged in infringing reproduction and temp tracking in the past, which have occasionally given rise to infringement claims.

118.    On information and belief, most or all previous temp track claims by other copyright holders have all been resolved prior to litigation – with non-disclosure clauses part of any settlements - in large part due to defendants' need to keep their infringing practices unknown outside of the music, advertising, and film industries.  See e.g., Exhibit 7.

119.    Defendants Bongiovi and Sambora, on information and belief, have reproduced copyrighted songs without the copyright owners' permission dozens of times in the course of their careers in Bon Jovi.

20

120.    Defendants Bongiovi and Sambora, on information and belief, have plagiarized copyrighted songs dozens of times during the course of their careers with Bon Jovi.

121.    As early as the 1980s, on information and belief, defendants Bongiovi and Sambora would solicit cassette tape recordings from young musical artists, often making false promises of career help.

122.    Defendants Bongiovi and Sambora, in the late 1980s, would spend nights sitting around defendant Sambora's piano, where they would blow through piles of such cassettes, deciding which portions they liked and would use on upcoming Bon Jovi songs.

123.    Defendants Bongiovi and Sambora, on information and belief, would take portions of the sound recordings solicited, duplicate them, record derivative versions, and incorporate those portions into Bon Jovi songs, all without the knowledge or permission of the copyright owners.

124.    Defendants Bongiovi and Sambora also have, on information and belief, throughout their careers in Bon Jovi, "borrowed" elements – riffs, progressions, lyrics, etc. - from established songwriters and musicians including, but not limited to, the Beatles, the Rolling Stones, Aerosmith, Credence Clearwater Revival, Bob Seger, and others, combining various elements from different original artists to create a facade of musical originality.

125.    In the late 1980s, defendant Bongiovi met a musician and singer, Joel Ellis ("Ellis") (also known as Joseph Gydosh) at the Rainbow Bar & Grill ("Rainbow") on Sunset Boulevard in Los Angeles.

126.    Ellis had just come from Paramount Studios in Hollywood, where he had been recording pre-production demos for Atlantic Records, including Ellis's song "I'll Be There."

127.    Ellis had the demo tape, which included "I'll Be There," with him as he entered the Rainbow.

128.    Ellis, who was friendly with the Rainbow's manager at the time, "Michael," asked if Ellis's demo tape could be played on the Rainbow's sound system.  Michael agreed.

129.    The late Sam Kinison invited Ellis to Kinison's table where defendant Bongiovi, Doc McGhee (Bon Jovi's manager at the time), Peter Aykroyd, Chris Grzybowski, Randy Meers, and others were sitting.

130.    Defendant Bongiovi told Ellis he loved the demo and asked if he could "borrow" it to play it for his (Bongiovi's) record label, telling Ellis the label might be interested.

131.    Bongiovi further said that he would talk to his uncle at Polydor Records and try to get Ellis's band at the time, Merri Hoaxx, on tour with Bon Jovi.

132.    Ellis reluctantly gave defendant Bongiovi the demo tape.

133.    Ellis never heard from defendant Bongiovi again.

134.    Within a year of that meeting, in September 1988, Bon Jovi released a song called "I'll Be There For You," which went on to reach number one in the Billboard Charts.

135.    "I'll Be There For You" contained a plagiarized version of Ellis's "I'll Be There" as the chorus and a plagiarized version of the Beatles' "Don't Let Me Down" as the verse.

136.    On information and belief, defendant Bongiovi had long wanted to "borrow" and incorporate the verse from the Beatles' "Don't Let Me Down" into a Bon Jovi song.

137.    On information and belief, defendants Bongiovi and Sambora have licensed their songs for, or created new songs solely for, use in commercial advertisements and for other commercial purposes.

138.    On information and belief, defendants Bongiovi and Sambora have fostered a false public image of creativity, originality, and musical integrity throughout the decades of Bon Jovi's existence by, among other things, concealing their use of others' works without permission and, more recently, hiding the purely commercial nature and origin of certain of their works.

139.    On information and belief, defendants TBS, Time Warner, Barry, Shimmel, Rovner, MLBAM, and Turner Sports have teamed with musical artists in past years to create commercial advertisements with soundtracks written specifically for said advertisements.

140.    On information and belief, said defendants utilize musical performers and other entertainers to produce "branded content" music and audiovisual works that are commercial advertisements portrayed as non-commercial creative works.

141.    The above process is sometimes called "music branding."

142.     On information and belief, above defendants enter joint ventures with said musical artists, paying for studio time and other production costs as part of the music branding process.

143.     On information and belief, above defendants obtain copyright ownership of the audiovisual – including the soundtrack - performed by the artists in the commercial advertisement.

144.     On information and belief, in exchange, said artists gain publicity and, after the commercial advertisement's soundtrack is completed, defendants may also pay for the production of a derivative musical work or entire album for the artists.

145.     On information and belief, the artists are allowed copyright ownership of the derivative work or works.

146.     On information and belief, above defendants and the artist or artist's publisher and record label agree to release the artists' derivative music first, as an album or single, after which the commercial - containing the artists' soundtrack - is released.

147.     On information and belief, the soundtracks and musical works described above are released in the reverse order in which they were created - to foster the false impression of prior independent artistic creation of the commercial advertisement's soundtrack.

148.     On information and belief, some or all of defendants named herein used a similar "musical branding" formula in creating the MLB Audiovisual.

149.     On information and belief, defendants named herein colluded with Bon Jovi to "musically brand" the 2007 and 2008 major league baseball playoffs on TBS and Fox,

24

using Steele's Team Song as a temp track for the MLB Audiovisual, which process

involved repeated infringing reproduction and unauthorized use of the Steele Team

Song.

150.     On information and belief, Bon Jovi's album, "Lost Highway," was released for sale -

by defendant MLBAM at MLB.com, among other places - prior to release of the MLB

Audiovisual.

151.     On information and belief, the 2:38:90-long (to fade ending) soundtrack to the

MLB Audiovisual was created prior to Bon Jovi's album, "Lost Highway."

152.     Bon Jovi's album, "Lost Highway," included a 4:38 derivative of the MLB

Audiovisual soundtrack, which Bon Jovi named "I Love This Town."

153.     On information and belief, defendants' release dates for the MLB Audiovisual and

Bon Jovi album, "Lost Highway," were contrived to conceal that one or more songs on

"Lost Highway" were first produced as for commercial purposes, including, but not

limited to, the soundtrack for the MLB Audiovisual.

154.     On information and belief, defendants' release dates also were planned so as to

contrive certain defendants' alibi, which said defendants asserted in <u>Steele</u> v. <u>TBS</u>, et al.,

08-11727 (D. Mass.), namely that Bon Jovi's "I Love This Town" had "nothing to do

with baseball," in direct contradiction to defendants' own earlier public statements.

155.     Defendant MLBAM is in the business of administration, sales and promotion of

MLB.com and baseball and non-baseball multimedia services to various baseball and

non-baseball clientele.

25

156.    Defendant MLBAM has produced, hosted, and promoted, and may, on information and belief, still host and promote, the websites of several popular music and other entertainers, including Bon Jovi.

157.    Defendant MLBAM sold Lost Highway on its website, www.mlb.com.

158.    Defendant MLBAM sold and may still sell Bon Jovi concert tickets at www.mlb.com and at MLBAM's subsidiary www.tickets.com.

159.    Defendant MLBAM profited and, on information and belief, may still profit from hosting Bon Jovi's website, selling Bon Jovi's albums (including "Lost Highway"), and through other income ostensibly generated by Bon Jovi, including but not limited to, touring and merchandise.

160.    Defendants TBS, Turner Sports, Time Warner, and other defendants profited directly from their partnership with Bon Jovi, MLBAM, and MLB, among others, through increased advertising revenue on TBS television stations resulting from "interstitials" (short segments, teasers) of the MLB Audiovisual – which could easily be mistaken, at least initially, for a music video, not a commercial -  being played in-between commercials on those stations.

VII.    **DEFENDANTS' 2007 AND 2008 MAJOR LEAGUE BASEBALL COMMERCIAL**

161.    On August 27, 2007 defendants Time Warner, MLBAM, TBS, Turner Sports, MLB, Bongiovi, and Sambora, released on MLB.com an audiovisual commercial – the MLB Audiovisual - to advertise 2007 baseball post-season television coverage by defendant TBS as well as Fox Sports.

26

162.    In 2008, TBS and Fox ran similar commercials incorporating the soundtrack, or

portions, thereof, from the 2007 MLB Audiovisual.  The factual allegations below

pertain to the 2007 MLB Audiovisual, of which the 2008 versions were, on information

and belief, derivatives.

163.    Numerous press releases were simultaneously issued on August 27, 2007 announcing

the new "spot."

164.    The MLB Audiovisual may be viewed by clicking (or Ctrl-clicking) on the following

link:

http://mlb.mlb.com/media/player/mp_tpl_3_1.jsp?w_id=595113&w=/2007/open/com
mercial/082707_tbs_bonjovi_ps_promo_400.wmv&pid=gen_video&vid=1&mid=2007
08272173402&cid=mlb&fid=gen_video400&v=2.

165.    The MLB Audiovisual and related promotion activity, from conception, to

worldwide multimedia distribution, was a massive and enormously expensive endeavor

involving hundreds of persons and dozens of companies nationally and around the

world.

166.    On information and belief, defendant Time Warner spent $386 million promoting

the major league baseball playoffs being broadcast on its networks.  Other defendants

also invested heavily in the campaign.

167.    The genesis and inspiration of the MLB Audiovisual was, on information and belief,

the Steele Team Song sound recording, derivative lyrics, and localized marketing ideas.

168.    Defendant Boston Red Sox have admitted receipt of the Steele Team Song sound

recording by their employee at the time, defendant Rourke.  On information and belief,

Rourke transmitted the Steele Team Song sound recording to others within the Red Sox organization and to other defendants, including Dee, Kennedy, and at least five other executives who held dual roles with defendants Boston Red Sox and FSG.

169.    Defendants further had repeated access to the Steele Team Song sound recording beginning in the fall of 2004 and continuing for the following two years during which time Steele regularly mailed and electronically transmitted the Steele Team Song sound recording to defendants Red Sox, MLBAM, and MLB.

170.    Similarly, defendants had Steele's lyric sheets, additional derivative lyrics marketable to any baseball town, and Steele's idea that his sound recording could be made into localized versions for different towns – by, for example, incorporating local landmarks - which is exactly what defendants did.

171.    The Steele Team Song sound recording was also popular in New England during the memorable 2004 baseball playoffs and world series, and the Steele Team Song sound recording was also heard in bars, on the radio, and could also be listened to by anyone with a computer and internet connection.

172.    From 2004 to the present, defendant FSG has contracted with defendant MLBAM to provide marketing concepts, plans, and services to MLBAM's clientele.  Defendant MLBAM's CEO, defendant Bowman, has been credited as a "matchmaker" in consummating such deals. Bowman has described FSG as a "significant contributor" to MLBAM's revenue.

173.    On information and belief, defendants FSG, Dee, Kennedy, and likely others - with and/or under the supervision of the Red Sox, NESE, Henry, Werner, and Lucchino – initially proposed Steele's song concept and baseball marketing plan to MLBAM for the benefit of MLBAM's client, MLB, as well as MLB's media partner, TBS.  The eventual result of defendants' joint efforts - based on Steele's Song's sound recording, derivative lyrics, and marketing ideas - was the MLB Audiovisual.

174.    The MLB Audiovisual displays the Red Sox four times more than any other team because of the contributions of FSG and the Red Sox to the conception, development, production, and marketing of the MLB Audiovisual, all of which originated with the Steele Song sound recording, derivative "Town" lyrics, and ideas for locally-focused versions and marketing.

175.    Defendant FSG's low public profile in relation to the MLB Audiovisual was intentional. According to Street & Smiths Sports Business Journal, "part of FSG's mystery, and charm to some, is the nimble, below-the-surface way in which it conducts much of its business. Its corporate consulting business, one virtually unnoticed in industry circles much less the general public, is a key driver of FSG revenue."

176.    On information and belief, defendant MLBAM contracted, hired, or otherwise worked with defendants TBS, Turner Sports, Turner Studios, Barry, Shimmel, and Langefels in order to, among other things, avail themselves of the particular skills and contacts of defendants Barry and Shimmel, who have a history and record of producing branded music and advertisements using temp tracks and celebrity entertainers.

177.    On information and belief, defendants MLBAM and MLB also contracted, hired, or otherwise worked with defendants TBS, Turner Sports, Turner Studios, Barry, Shimmel, and Langefels, among others, to produce of the final MLB Audiovisual – as opposed to producing it "in-house" – to minimize MLBAM and its principals' profiles and potential exposure to copyright infringement liability.

178.    Defendant MLBAM, in <u>Steele</u> v. <u>TBS</u>, et al., No. 08-11727 (D. Mass.) further attempted to shield itself from liability by willfully defaulting and having defendant MLB voluntarily appear in its stead.  Steele's Motion for Entry of Default as to MLBAM in that case is pending.

179.    Defendant MLBAM, in <u>Steele</u> v. <u>TBS</u>, et al., No. 08-11727 (D. Mass.), further attempting to stay "in the weeds," termed the MLB Audiovisual "the Turner Promo," despite MLBAM's copyright ownership of the MLB Audiovisual.

180.    Defendant MLBAM and other defendants in <u>Steele</u> v. <u>TBS</u>, et al., No. 08-11727 (D. Mass.), submitted false evidence in the form of an altered MLB Audiovisual from which the MLBAM copyright notice had been deleted in another attempt to hide itself. Steele has raised this issue in his appeal of <u>Steele</u> v. <u>TBS</u>, et al., No. 08-11727 (D. Mass.), which is pending (No. 09-2571) (1st Cir.).

181.    On information and belief, MLBAM and Bowman solicited and facilitated the inclusion and contributions of their clients - Bon Jovi and defendants Bongiovi, and Sambora - in the MLB Audiovisual.  Bongiovi and Sambora have a history and record of

delivering and promoting corporate branded messaging through Bon Jovi's music and videos.

182. On information an belief, Rovner, Barry, and Shimmel facilitated the material involvement and contributions of Bongiovi and Sambora to the temp track, soundtrack, and visual elements of the MLB Audiovisual.

183. In the pre-production phase of the MLB Audiovisual, the Steele Song sound recording was digitally transmitted (reproduced) between, amongst, and within dozens of corporate entities and among at least as many individuals while the Steele Team Song sound recording, derivative lyrics, and marketing idea were evaluated, analyzed, and studied.

184. On information and belief, defendants involved in pre-production include, but are not limited to, defendants Bowman, Boston Red Sox, Barry, FSG, Rovner, Bongiovi, Henry, Lucchino, MLBAM, MLB, Shimmel, Dee, NESE, Sambora, Kennedy, Werner, Time Warner, TBS, Turner Sports, Turner Studios, Vector,  and Falcon ("pre-production defendants").

185. On information and belief, each and every pre-production defendant, during the months of pre-production, budgeting, and planning copied and transmitted the Steele Team sound recording amongst each other, within computers of corporate defendants, and among individual and corporate defendants.

186. Following pre-production was the production phase, during which time the Steele Team Song sound recording was digitally transmitted (reproduced) between, amongst,

and within a number of corporate entities and individuals responsible for production of the MLB Audiovisual.

187.     On information and belief, defendants involved in the production stage of the MLB Audiovisual include, but are not limited to, defendants Ricigliano, Bowman, Boston Red Sox, Langefels, Barry, Donato, FSG, Rovner, Bongiovi, MLBAM, MLB, Shimmel, NESE, Sambora, Time Warner, TBS, Turner Sports, Turner Studios, Vector,  and Falcon ("production defendants").

188.     On information and belief, each and every production defendant, during the weeks and months of digitally creating, manipulating, and editing the images and soundtracks of drafts of the MLB Audiovisual, copied and transmitted the Steele Team sound recording amongst each other, within computers of corporate defendants, and among individual and corporate defendants.

189.     Defendants, in designing, creating, producing, and marketing the MLB Audiovisual acted beyond their stated positions and titles within their business entity or within the standard scopes of their titles within the music, television, film, advertising, and marketing industries, during which time the Steele Team Song sound recording was repeatedly reproduced.

190.     Defendants were involved in a project of scale whereby, for example, defendant Rovner, a band manager, and his client, Bon Jovi – ostensibly a creatively independent rock band, not an advertising agency, commercial music house, or multimedia production company -  took on the role of helping craft and market an audiovisual

commercial advertising TBS's broadcast of the major league baseball playoffs in 2007 and 2008.

191.    Similarly, MLBAM and MLB, its principals, and individuals employed thereby were – and still are – deeply involved in many highly profitable non-baseball operations, including music and other non-baseball advertising, such as their hands-on production of the MLB Audiovisual.

192.    Defendants Boston Red Sox, FSG, and NESE, their principals – defendants Henry, Werner, Lucchino, Dee, and Kennedy - and individuals employed thereby were similarly involved in non-baseball multimedia production, television advertising, and cross-promotion with defendants Bongiovi, Sambora, Rovner, Shimmel, Barry, Vector, Time Warner, TBS, and others.

193.    Defendant Ricigliano, a well-known musical scientist by training, involved in the historical and scientific study of music, on information and belief, "cleared," as defined above, the MLB Audiovisual prior to its release, to help defendants conceal infringement of the Steele Team Song sound recording for commercial purposes.

194.    Ricigliano's process of "clearing" the MLB Audiovisual, on information and belief, involved repeated reproduction, transmission, or other unauthorized use of the Steele Team Song sound recording as Ricigliano advised his clients – the other production defendants – how to edit the MLB Audiovisual to prevent detection of defendants' infringement of the Steele Team Song sound recording.

195.    On information and belief, defendant Donato similarly "cleared," as defined above, the MLB Audiovisual prior to its release, reproducing the Steele Team Song during the process.

196.    In <u>Steele</u> v. <u>TBS</u>, et al., above, No. 08-11727 (D. Mass), Steele alleged that defendants MLB, MLBAM, Bongiovi, Sambora, Shimmel, Vector, Falcon, TBS, and others used the Steele Team Song as a temp track during the creation of the MLB Audiovisual.

197.    Said defendants, during the litigation of <u>Steele</u> v. <u>TBS</u>, et al., above, failed to dispute that they used the Steele Team Song as a temp track during the creation of the MLB Audiovisual, instead asserting a "substantial similarity" defense, which does not apply here.

198.    Given defendants' experience in advertising, music, film, and copyright issues, defendants knew or should have known that creation of the MLB Audiovisual infringed Steele's sound recording copyright in the Steele Team Song.

## VIII.   <u>GENERAL ALLEGATIONS</u>

199.    Each defendant named herein infringed Steele's exclusive rights in the Steele Team Song sound recording, pursuant to 17 U.S.C. §  114, by the infringing reproduction and unauthorized use of the Steele Team Song sound recording prior to, and during, pre-production and production of the MLB Audiovisual.

200.    Each defendant named herein directly infringed Steele's exclusive rights in the Steele Team Song sound recording by reproducing the Steele Team Song sound recording

34

without Steele's permission by sending, forwarding, or otherwise transmitting by e-mail or internet, or by copying or downloading by digital means, or otherwise illegally copying, the Steele Team Song sound recording before and during the pre-production and production of the MLB Audiovisual.

201.    Certain defendants named herein also vicariously infringed Steele's exclusive rights in the Steele Team sound recording by having the right and ability to direct and control persons who sent, forwarded, or otherwise transmitted by e-mail or internet, or copied or downloaded by digital means, or otherwise illegally copied, the Steele Team Song sound recording before and during the pre-production and production of the MLB Audiovisual.

202.    Defendants' infringing reproduction, direct and vicarious, included, but was not limited to, the pre-production and production of the MLB Audiovisual, during which time the Steele Team sound recording was used, without Steele's permission, as a temp track for the MLB Audiovisual.

203.    Each defendant had a direct financial interest in their direct and/or vicarious infringing reproduction of the Steele Team Song sound recording.

## COUNT I – DIRECT COPYRIGHT INFRINGEMENT
### 17 U.S.C. §§ 114

204.    Plaintiff Steele re-pleads and re-alleges each and every allegation of paragraphs 1 through 203, inclusive, as if specifically pleaded herein.

205.    Steele is the copyright owner of the Steele Team Song sound recording, Copyright

Registration Number  SR 640-991, a copy of which is attached as Exhibit 1.

206.    Each and every defendants' unauthorized digital transmission, copying, and

downloading, and/or copying by other means, of the Steele Team Song sound recording

directly infringed Steele's copyrights to the Steele Team Song sound recording.

207.    Ricigliano reproduced the Steele Team Song sound recording without Steele's

authorization, directly infringing Steele's exclusive rights under 17 U.S.C. § 114.

208.    Defendant Bowman reproduced the Steele Team Song sound recording without

Steele's authorization, directly infringing Steele's exclusive rights under 17 U.S.C. § 114.

209.    Defendant Boston Red Sox reproduced the Steele Team Song sound recording

without Steele's authorization, directly infringing Steele's exclusive rights under 17

U.S.C. § 114.

210.    Defendant Langefels reproduced the Steele Team Song sound recording without

Steele's authorization, directly infringing Steele's exclusive rights under 17 U.S.C. § 114.

211.    Defendant Barry reproduced the Steele Team Song sound recording without Steele's

authorization, directly infringing Steele's exclusive rights under 17 U.S.C. § 114.

212.    Defendant Donato reproduced the Steele Team Song sound recording without

Steele's authorization, directly infringing Steele's exclusive rights under 17 U.S.C. § 114.

213.    Defendant FSG reproduced the Steele Team Song sound recording without Steele's

authorization, directly infringing Steele's exclusive rights under 17 U.S.C. § 114.

214.    Defendant Rovner reproduced the Steele Team Song sound recording without Steele's authorization, directly infringing Steele's exclusive rights under 17 U.S.C. § 114.

215.    Defendant Rourke reproduced the Steele Team Song sound recording without Steele's authorization, directly infringing Steele's exclusive rights under 17 U.S.C. § 114.

216.    Defendant Bongiovi reproduced the Steele Team Song sound recording without Steele's authorization, directly infringing Steele's exclusive rights under 17 U.S.C. § 114.

217.    Defendant Henry reproduced the Steele Team Song sound recording without Steele's authorization, directly infringing Steele's exclusive rights under 17 U.S.C. § 114.

218.    Defendant Lucchino reproduced the Steele Team Song sound recording without Steele's authorization, directly infringing Steele's exclusive rights under 17 U.S.C. § 114.

219.    Defendant MLBAM reproduced the Steele Team Song sound recording without Steele's authorization, directly infringing Steele's exclusive rights under 17 U.S.C. § 114.

220.    Defendant MLB reproduced the Steele Team Song sound recording without Steele's authorization, directly infringing Steele's exclusive rights under 17 U.S.C. § 114.

221.    Defendant Shimmel reproduced the Steele Team Song sound recording without Steele's authorization, directly infringing Steele's exclusive rights under 17 U.S.C. § 114.

222.    Defendant Dee reproduced the Steele Team Song sound recording without Steele's authorization, directly infringing Steele's exclusive rights under 17 U.S.C. § 114.

223.    Defendant NESE reproduced the Steele Team Song sound recording without Steele's authorization, directly infringing Steele's exclusive rights under 17 U.S.C. § 114.

224.    Defendant Sambora reproduced the Steele Team Song sound recording without Steele's authorization, directly infringing Steele's exclusive rights under 17 U.S.C. § 114.

225.    Defendant Kennedy reproduced the Steele Team Song sound recording without Steele's authorization, directly infringing Steele's exclusive rights under 17 U.S.C. § 114.

226.    Defendant Werner reproduced the Steele Team Song sound recording without Steele's authorization, directly infringing Steele's exclusive rights under 17 U.S.C. § 114.

227.    Defendant Time Warner reproduced the Steele Team Song sound recording without Steele's authorization, directly infringing Steele's exclusive rights under 17 U.S.C. § 114.

228.    Defendant TBS reproduced the Steele Team Song sound recording without Steele's authorization, directly infringing Steele's exclusive rights under 17 U.S.C. § 114.

229.    Defendant Turner Sports reproduced the Steele Team Song sound recording without Steele's authorization, directly infringing Steele's exclusive rights under 17 U.S.C. § 114.

230.    Defendant Turner Studios reproduced the Steele Team Song sound recording without Steele's authorization, directly infringing Steele's exclusive rights under 17 U.S.C. § 114.

231.    Defendant Vector reproduced the Steele Team Song sound recording without Steele's authorization, directly infringing Steele's exclusive rights under 17 U.S.C. § 114.

232.    Defendant Falcon reproduced the Steele Team Song sound recording without Steele's authorization, directly infringing Steele's exclusive rights under 17 U.S.C. § 114.

233.    Defendants' infringement of Steele's copyrights in the Steele Team Song sound recording has damaged Steele in an amount to be proven at trial.

234.    Each and every defendants' infringement was willful.

## COUNT II – VICARIOUS COPYRIGHT INFRINGEMENT
### 17 U.S.C. §§ 106, 114

235.    Plaintiff Steele re-pleads and re-alleges each and every allegation of paragraphs 1

through 234, inclusive, as if specifically pleaded herein.

236.    Steele is the copyright owner of the Steele Team Song sound recording, Copyright

Registration Number  SR 640-991, a copy of which is attached as Exhibit 1.

237.    Each defendant listed below had the right and ability to direct and control

defendants' or other persons' unauthorized digital transmission, copying, and

downloading, and/or copying by other means, of the Steele Team Song sound recording

and thereby vicariously infringed Steele's copyrights to the Steele Team Song sound

recording.

238.    Each and every defendant listed below directly profited from their vicarious

infringement of Steele's exclusive rights in the Steele Team Song sound recording

copyright.

239.    Defendant Ricigliano had the right and ability to direct and control persons who

directly reproduced the Steele Team Song sound recording without Steele's authorization

and thereby vicariously infringed Steele's exclusive rights under 17 U.S.C. § 114.

240.    Defendant Bowman had the right and ability to direct and control persons who

directly reproduced the Steele Team Song sound recording without Steele's authorization

and thereby vicariously infringed Steele's exclusive rights under 17 U.S.C. § 114.

241.    Defendant Boston Red Sox had the right and ability to direct and control persons who directly reproduced the Steele Team Song sound recording without Steele's authorization and thereby vicariously infringed Steele's exclusive rights under 17 U.S.C. § 114.

242.    Defendant Barry had the right and ability to direct and control persons who directly reproduced the Steele Team Song sound recording without Steele's authorization and thereby vicariously infringed Steele's exclusive rights under 17 U.S.C. § 114.

243.    Defendant Donato had the right and ability to direct and control persons who directly reproduced the Steele Team Song sound recording without Steele's authorization and thereby vicariously infringed Steele's exclusive rights under 17 U.S.C. § 114.

244.    Defendant FSG had the right and ability to direct and control persons who directly reproduced the Steele Team Song sound recording without Steele's authorization and thereby vicariously infringed Steele's exclusive rights under 17 U.S.C. § 114.

245.    Defendant Rovner had the right and ability to direct and control persons who directly reproduced the Steele Team Song sound recording without Steele's authorization and thereby vicariously infringed Steele's exclusive rights under 17 U.S.C. § 114.

246.    Defendant Bongiovi had the right and ability to direct and control persons who directly reproduced the Steele Team Song sound recording without Steele's authorization and thereby vicariously infringed Steele's exclusive rights under 17 U.S.C. § 114.

247.    Defendant Henry had the right and ability to direct and control persons who directly reproduced the Steele Team Song sound recording without Steele's authorization and thereby vicariously infringed Steele's exclusive rights under 17 U.S.C. § 114.

248.    Defendant Lucchino had the right and ability to direct and control persons who directly reproduced the Steele Team Song sound recording without Steele's authorization and thereby vicariously infringed Steele's exclusive rights under 17 U.S.C. § 114.

249.    Defendant MLBAM had the right and ability to direct and control persons who directly reproduced the Steele Team Song sound recording without Steele's authorization and thereby vicariously infringed Steele's exclusive rights under 17 U.S.C. § 114.

250.    Defendant MLB had the right and ability to direct and control persons who directly reproduced the Steele Team Song sound recording without Steele's authorization and thereby vicariously infringed Steele's exclusive rights under 17 U.S.C. § 114.

251.    Defendant Dee had the right and ability to direct and control persons who directly reproduced the Steele Team Song sound recording without Steele's authorization and thereby vicariously infringed Steele's exclusive rights under 17 U.S.C. § 114.

252.    Defendant NESE had the right and ability to direct and control persons who directly reproduced the Steele Team Song sound recording without Steele's authorization and thereby vicariously infringed Steele's exclusive rights under 17 U.S.C. § 114.

253.    Defendant Sambora had the right and ability to direct and control persons who directly reproduced the Steele Team Song sound recording without Steele's authorization and thereby vicariously infringed Steele's exclusive rights under 17 U.S.C. § 114.

254. Defendant Kennedy had the right and ability to direct and control persons who directly reproduced the Steele Team Song sound recording without Steele's authorization and thereby vicariously infringed Steele's exclusive rights under 17 U.S.C. § 114.

255. Defendant Werner had the right and ability to direct and control persons who directly reproduced the Steele Team Song sound recording without Steele's authorization and thereby vicariously infringed Steele's exclusive rights under 17 U.S.C. § 114.

256. Defendant Time Warner had the right and ability to direct and control persons who directly reproduced the Steele Team Song sound recording without Steele's authorization and thereby vicariously infringed Steele's exclusive rights under 17 U.S.C. § 114.

257. Defendant TBS had the right and ability to direct and control persons who directly reproduced the Steele Team Song sound recording without Steele's authorization and thereby vicariously infringed Steele's exclusive rights under 17 U.S.C. § 114.

258. Defendant Turner Sports had the right and ability to direct and control persons who directly reproduced the Steele Team Song sound recording without Steele's authorization and thereby vicariously infringed Steele's exclusive rights under 17 U.S.C. § 114.

259. Defendant Turner Studios had the right and ability to direct and control persons who directly reproduced the Steele Team Song sound recording without Steele's authorization and thereby vicariously infringed Steele's exclusive rights under 17 U.S.C. § 114.

260.   Defendant Vector had the right and ability to direct and control persons who directly reproduced the Steele Team Song sound recording without Steele's authorization and thereby vicariously infringed Steele's exclusive rights under 17 U.S.C. § 114.

261.   Defendants' vicarious infringement of Steele's copyrights in the Steele Team Song sound recording has damaged Steele in an amount to be proven at trial.

262.   Defendants' vicarious infringement was willful.

## JURY DEMAND

263.   Steele demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff Steele respectfully demands judgment in his favor as follows:

264.   Awarding Steele actual damages for defendants' copyright infringement;

265.   Awarding Steele the profits realized by defendants as a result of their infringement of Steele's copyrights to the Steele Team Song sound recording;

266.   Ordering defendants to render an accounting to Steele for any and all gains, profits, and benefits derived from defendants' willful infringement of the Steele Team Song sound recording and ordering that all such amounts be deemed to be held in constructive trust for Steele.

267.   Awarding Steele costs and expenses incurred in pursuing this action, including but not limited to attorneys' fees.

268.   Awarding Steele further and additional relief as this Court deems just and equitable.

## INDIVIDUAL VERIFICATION

I, Samuel Bartley Steele, a competent person of the full age of majority, declare under the pains and penalties of perjury:

1. I am the plaintiff in this case.

2. I have read this complaint attached hereto and know the contents thereof and the same are true to my knowledge, except for those matters therein stated to be alleged on information and belief, an as to those matters, I believe them to be true.

Samuel Bartley Steele

Dated: August 24th, 2010

WHEREFORE, Plaintiff Samuel Bartley Steele seeks the relief requested above as well as an award of pre-judgment interest, post-judgment interest, attorney's fees and costs, and any other form of relief which the Court that this Honorable Court deems just and proper.

Dated:  August 25, 2010

Plaintiff Samuel Bartley Steele,
by his counsel,

/s/Christopher A.D. Hunt
Christopher A.D. Hunt
MA BBO# 634808
THE HUNT LAW FIRM LLC
10 Heron Lane
Hopedale, MA 01747
(508) 966-7300
cadhunt@earthlink.net

## CERTIFICATE OF SERVICE

I, Christopher A.D. Hunt, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on August 25, 2010.

Dated:  August 25, 2010

 /s/ Christopher A.D. Hunt
Christopher A.D. Hunt